## SCHULTE et al. v. REPUBLIC SUPPLY CO.*
### (No. 8849.)

Court of Civil Appeals of Texas. Galveston. May 17, 1927.

Rehearing Denied June 30, 1927.

**1. Appeal and error ☞934(1)—Every presumption will be indulged and doubts resolved in favor of judgment of court sitting without jury, in absence of filing of findings and conclusions.**

Every presumption not inconsistent with the record will be indulged and any doubts as to facts and law applicable under the pleadings and evidence will be resolved in favor of the judgment of the court sitting without a jury, where there are no findings of fact or conclusions of law filed in the trial court.

**2. Attachment ☞375(1)—Levy under attachment writ on drilling equipment did not constitute conversion against owner's lessee, where operation was not disturbed.**

Levy under writ of attachment at instance of alleged creditor of the owner of drilling equipment *held* not to constitute a conversion or give rise to compensable damage as to the owner's lessee, where sheriff did not forbid continued use of the equipment or disturb its arrangement or operation.

**3. Attachment ☞363—Attachment by lessor's creditor of drilling equipment cannot constitute conversion against receiver of syndicate, who is without right except under lessee who is not disturbed.**

Attachment of drilling equipment by an alleged creditor of the owner and lessor cannot constitute conversion as against the receiver of an oil syndicate for whom the lessee of equipment was drilling a well, where the receiver is without right to its possession except under the lessee whose operation is not disturbed.

**4. Attachment ☞375(1)—Wrongful levy of attachment writ on drilling equipment does not give rise to damages, in absence of disturbance of possession.**

Mere wrongful levy of attachment writ on oil drilling equipment does not give rise to dam-

ages, in absence of a disturbance of the possession and actual loss proximately resulting therefrom.

**5. Attachment ☞379—Whether levy of attachment writ or financial condition of oil syndicate caused shut down of drilling operations held question for court sitting without jury.**

Whether situation and financial condition of oil syndicate rather than levy of an attachment writ was the cause of shut down of drilling operations *held* question for trial court sitting without jury, in suit for damages for alleged wrongful attachment.

**6. Attachment ☞375(1)—Actual possession must be taken, to constitute "conversion" by wrongful levy of personal property in owner's hands (Rev. St. 1925, art. 3793).**

As respects damages, to constitute a "conversion" by wrongful levy on personal property in the hands of its owner, under Rev. St. 1925, art. 3793, there must be a taking of actual possession.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conversion.]

Appeal from District Court, Matagorda County; M. S. Munson, Judge.

Action by Paul Schulte and another against the Republic Supply Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

Boyles, Brown & Scott, Stevens & Stevens, and C. F. Stevens, all of Houston, for appellants.

Jno. G. Logue, Richard Burns, and Andrews, Streetman, Logue & Mobley, all of Houston, for appellee.

GRAVES, J. This suit was brought by Paul Schulte individually and E. L. McDonald, as receiver of the Monarch Oil Syndicate No. 1, against the Republic Supply Company, to recover damages for an alleged unlawful seizure and conversion, under a writ of attachment sued out at the instance of the supply company against J. W. Gillespie, of certain oil well machinery, referred to as "equipment," sold by it to Gillespie, which was then being used by Schulte in drilling an oil well for the syndicate on its lease in the Markham field, in Matagorda county.

[1] The cause was tried before the court without a jury, and resulted in a judgment in favor of the defendant. There were no findings of fact or conclusions of law filed in the trial court.

The rule on appeal in such instance is:

"Every presumption not inconsistent with the record will be indulged in favor of the judgment, and any doubts as to the facts raised by the evidence and any view of the law which the trial court could have applied under the pleadings and evidence in the case will be resolved in support of the judgment." Byers v. Thacker, 42 Tex. Civ. App. 492, 94 S. W. 138; Campbell v. Teeple (Tex. Civ. App.) 273 S. W. 304; Cisco

& N. E. R. Co. v. Texas Pipe Line Co. (Tex. Civ. App.) 240 S. W. 990; Diltz v. Dodson (Tex. Civ. App.) 207 S. W. 356; First State Bank of Amarillo v. Jones (Tex. Civ. App.) 171 S. W. 1057; Hines v. Kansas City Life Ins. Co. (Tex. Civ. App.) 260 S. W. 690; King v. Pond, (Tex. Civ. App.) 283 S. W. 607; Robertson v. Lee (Tex. Civ. App.) 230 S. W. 730.

The reaches of the cause here will be measured accordingly.

[2] Schulte was drilling the well for the oil syndicate under a contract between them, and for that purpose rented, for a period not definitely appearing, at $800 per month, a drilling rig from J. W. Gillespie, which included the "equipment" in question—that is, an A. W. P. Co. swivel, a 45 H. P. Rep. Spec. boiler, a Gardner boiler pump, and other inconsequential appliances; this rental contract merely gave Schulte the right to use the rig in drilling the well so long as he paid Gillespie, its owner, $800 per month for the privilege; the attachment writ, issued by the district court of Harris county against J. W. Gillespie alone, was delivered to Frank Carr, as sheriff of Matagorda county, he being also at that particular time receiver for the Monarch Syndicate, and, according to the two officers themselves, was levied by him as such, acting through his deputy, Oscar Barber, substantially in this way. The sheriff testified:

"I have never at any time on any occasion told Mr. Schulte that I would have to shut him down out there on that rig. * * * I never at any time told him before or after this writ of attachment was placed in my hands, that I was going to have to shut him down out there. *. * * I never did instruct my deputy, Mr. Barber, to close down the operations on this rig. I never did tell Mr. Schulte, or my successor receiver, Mr. McDonald, or Mr. Cahill, or any one connected with that operation out there, that they couldn't use this machinery, or that they had to shut down that operation. As to what instructions did I give these watchmen about the property, these watchmen were put there on some reports that might have been true and might not have as to there might be some damage done to that property, and there was no instruction given them other than to go there and protect the property. I did not instruct them not to let Mr. Schulte or the crew that was working there not to use this property. Reports had come to me that the property there might be damaged. And acting on those reports, I sent the watchmen out there. I sent them out there simply to look after the property and see that it was not moved away, and for absolutely nothing else in the. world. No, sir; I gave no instructions to the watchmen to prevent the use of the machinery; absolutely nothing of the kind. * * *

"The only thing I did was to instruct my deputy when he went there to make a list of the property as pointed out by the representative of the Republic Supply Company, and to put a guard over them day and night to see that nothing was taken away. I did not instruct the guard that I placed there not to let any one use the property; no instructions of that kind were given to anybody. There was nothing to prevent me from using it had I wanted to go ahead and drill the well. I didn't tell Mr. Schulte not to use it. I wouldn't have stopped the use of it if any one had thought to use it. I merely had a watchman go down there, simply to see that these properties that were levied on were not removed from the premises. Yes, sir; I merely felt responsible for the custody of them. I never did disconnect anything. I didn't turn any of that machinery over to the Republic Supply Company."

The deputy verified these statements as follows:

"You have asked me to tell the court just what I did on that occasion in reference to making the levy of the attachment. Well, this gentleman over there (pointing), Mr. McCullough, went with me that afternoon. I believe we waited around here most of the day; in fact, it was rather late that afternoon when we went out; and he went with me to point out the stuff that was mentioned in the indemnity bond. We went out there and he pointed it out; that's just about all there was to it. Mr. Cahill probably was there, and some other man, and we made it known to them what we were there for and made the attachment. That's about all. I don't recall that we had any special conversation with Mr. Cahill, nothing relative to this attachment, I don't think. I did not tell Mr. Cahill that I had come out there to shut him down. I did not tell Mr. Cahill that he would have to shut down. I didn't have any conversation with him at all about his shutting down; there was no occasion for it, because I had no instructions to that effect. I simply explained to him that I had this attachment and the particular property that I was levying on. As to whether or not I told him what particular pieces of machinery I was levying on, it was all pointed out. I just went around with this indemnity bond and made a lead pencil check, checking the machinery that was in the bond. On that bond there are some check marks. As to what they indicate, well, I don't know that I made them; they might have indicated that this certain property was found. Now, there are some lines drawn through certain pieces of property, as I see from looking at the indemnity bond which you have just handed me. I don't recall just what that was. Oh, yes; they indicate property not found; property not found would be my interpretation of it; it is not clear to my mind just at this time. My interpretation of it at this time would be that the lines drawn indicate property not found, and the check marks indicate the property that I found. I did not actually lay hands on anything there at all. I did not take anything off, nor disturb anything there. I didn't disconnect a thing. I made no demand whatever upon Mr. Cahill, or anybody else, to disconnect anything.. I have no recollection of Mr. Cahill telling me that he would disconnect any of this machinery, or of any such statement by him. We had no conversation whatever that I can now recall with reference to disconnecting any of this machinery. I don't recall Mr. Cahill saying anything to me about using any of the machinery to mud up the hole with. No, sir; I didn't tell him that he couldn't use the machinery. As to

(297 S.W.)

whether I had any conversation at all with him about whether he would or would not use it, I don't recall it; I wasn't there shutting him down at all, I was simply there to attaah the stuff; and I believe that Mr. Carr was to put a guard there to watch over it, but so far as disturbing the physical condition of that rig, I did not. I did not tell him that I had come out there to shut him down. * * * I had made no attempt to disturb the arrangement of that machinery or the operation of it."

Mr. McCullough, the supply company's agent, to whom the deputy sheriff referred as having pointed the "equipment" out to him for the purpose of levying upon it, in effect corroborated the latter's testimony.

This manner of levy was made November 28, 1922, and Frank Carr resigned as receiver for the syndicate within 4 days thereafter, on December 2d, being on that date succeeded as such by appellant E. L. McDonald.

It was further shown that about one month after the levy, such control over it as the sheriff thereby took having continued throughout the interim, receiver McDonald removed this machinery from the well, Mr. Schulte's own employees doing the work, and that the appellee never took possession of or received any part of it.

There was some testimony to the contrary, but that should be rejected under the rule and supporting authorities cited, if there was in the record enough, inclusive of that referred to, to support the judgment. We think there was. As finally insisted upon, appellant's sole claim for damages was for $6,000 necessary expenses in subsequently bringing the hole back, by the use of other machinery, to the point where their drilling upon it with that here involved was alleged to have been interrupted by this levy at the instance of appellee; that in turn rests upon their contention that the sheriff's undisputed acts constituted such dominion over the property as amounted to a conversion of it against them.

We cannot agree that there was, under such acts, either a conversion or consequent compensable damage.

[3] There could have been no conversion of this equipment as against appellant receiver, because he neither had a contract for its use with the owner, Gillespie, nor was a party to that between the latter and Schulte, hence was without right, except under Schulte, either to its use or possession.

As concerns Schulte himself, a like result follows, because he only had the restricted right under his rental contract with Gillespie to use these appliances in drilling the well in question, and that right was not interfered with, as appears from this repetition of the levying officer's testimony:

"I did not actually lay hands on anything there. I did not take anything off, nor disturb anything there. I did not disconnect a thing. I made no demand whatever upon Mr. Cahill, or upon any one else, to disconnect anything.

I didn't tell him that he couldn't use the machinery. I wasn't there shutting him down at all. I was simply there to attach the stuff. * * *

"I had made no attempt to disturb the arrangement of that machinery or the operation of it"

To this must be added the also previously recited fact that this status of the property remained unchanged until it was finally removed from the well by the appellants themselves, none of it ever having come into the possession or control of the appellee.

The "undisputed facts" therefore, to which appellants' contention is reduced for dependence, are that the sheriff gave them notice of the attachment and left watchmen out there "simply to look after the property and see that it was not moved away" until they themselves removed it to make way for their new machinery; conceding the academic soundness of appellant Schulte's insistence that as bailee of Gillespie he was in possession of the property for the purposes of their rental contract and entitled to have it protected, he thus fails to show that he was deprived of that right. The most that could have resulted was a constructive possession by the sheriff which did not in any way interfere with his right to continue drilling the well with this equipment and that is all he claims he had; his control of it for that purpose and consequently his sole property right in it not having been disturbed, there was no conversion of it against him. France v. Gibson (Tex. Civ. App.) 101 S. W. 536; Gulf, C. & S. F. R. Co. v. Bank (Tex. Com. App.) 270 S. W. 1008, par. 2, and cited authorities.

[4] Neither do damages necessarily flow merely from the naked levy of an attachment writ, even though wrongful; the right to such a recovery rests upon a disturbance of the possession, or a deprivation of the use of the property, together with proof of the actual loss proximately resulting therefrom. Spillman v. Weston (Tex. Civ. App.) 200 S. W. 557; Low v. NeSmith (Tex. Civ. App.) 77 S. W. 32.

[5] Not only must the trial court be deemed to have found no such interference with appellant Schulte's right, but there was also testimony from which it might have further concluded that the levy was not the proximate cause of the shut down or discontinuance of the use of this machinery in drilling the well; at that date, November 28, 1922, the oil syndicate was insolvent, in the hands of a receiver, and without funds for going on with the work; Schulte himself had previously been supplying the necessary money, but had declined to advance more up to the time the receiver was appointed; between that date and the levy, by the undisputed evidence, no agreement or contract had been made under which the receiver had authorized him or any one else to proceed with the drilling of this well.

[6] It is easily inferable from these circumstances that the trial court believed the situation and condition of the oil syndicate, rather than the levy of the writ, to have been the real cause of the shut down.

These conclusions determine the appeal adversely upon general principles, we think, without reference to our statute relating to how writs of attachment may be levied upon personal property (R. S. art. 3793); were the statute looked to, however, no different result could follow the findings so attributable to the court; even if appellant Schulte be regarded as an individual owner entitled to the possession of the equipment (which his brief ably urges he should be), there was lacking the sine qua non of a conversion, the taking of actual possession, as that statute has been construed by our courts (Kessler v. Halff, 21 Tex. Civ. App. 91, 51 S. W. 48; Jones et al. v. Bank, 106 Tex. 572, 173 S. W. 202).

The judgment has been affirmed.

Affirmed.